UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| LUCINDA NICHOLS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:04-CV-245RM |
| | ) | |
| MISHAWAKA POLICE DEPARTMENT, | ) | |
| CITY OF MISHAWAKA, INDIANA, | ) | |
| | ) | |
| Defendants | ) | |

## OPINION AND ORDER

Lucinda Nichols, who worked for the City of Mishawaka, Indiana, as a police dispatcher from late 2002 to May 2003, sues Mishawaka under Title VII for subjecting her to a hostile work environment based on sexual harassment and for retaliating against her for complaining of sexual harassment. Mishawaka has moved for summary judgment. For the reasons that follow, the court grants the motion in part and denies it in part.

### MOTION TO STRIKE

Summary judgment rulings ordinarily begin with a recitation of the facts viewed most favorably to the non-moving party, but Mishawaka's motion to strike requires the court to start by determining the content of the summary judgment record. Ms. Nichols submitted three affidavits in opposition to the summary judgment motion, and Mishawaka has moved to strike all or part of each.

Mishawaka moves to strike Charlene Monges's affidavit in its entirely because, Mishawaka contends, Ms. Nichols's attorney violated Rule 4.2 of the Rules of Professional Conduct, which governs practice in this court pursuant to District Rule DE-IV. *See* <u>Brown v. St. Joseph County</u>, 148 F.R.D. 246, 249 (N.D. Ind. 1993). Rule 4.2 forbids an attorney from direct communication with a represented party. The commentary to the rule addresses communication with a represented party's employee:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

Mishawaka argues that Ms. Monges is a supervisory employee (interim director of the dispatch center employees) who claims to have witnessed events that form the subject of the litigation.

Ms. Monges's affidavit reports that she complained about some of the harassment that Ms. Nichols alleges, offers interpretation of Mishawaka's personnel policy, reports statements made by police officials, and opines about the environment in the workplace and Ms. Nichols's conduct. Mishawaka fears Ms. Monges's assertions fall within the course and scope of her employment and could hurt or bind Mishawaka. *See* <u>Bussell v. Minix</u>, 926 F. Supp. 809, 811 (N.D. Ind. 1996).

The record discloses no violation of Rule 4.2. There is no indication that Ms. Nichols's attorneys have spoken with Ms. Monges since Ms. Monges became a supervisor. Mishawaka says Ms. Monges was a co-employee of Ms. Nichols and took over a supervisory position as of April 25, 2005. Mishawaka's attorney says Ms. Nichols's attorney mentioned the impending promotion at a deposition on April 19, 2005. By that time, though, Ms. Monges already had given her information to Ms. Nichols's counsel and had signed the affidavit.

Ms. Nichols's attorney reports that he met with Ms. Monges in late January and did not discuss Ms. Monges's knowledge until he assured himself that he could speak with her consistent with Rule 4.2. On April 13, Ms. Monges signed the affidavit Ms. Nichols submitted in response to Mishawaka's summary judgment motion. On April 16, Ms. Nichols's attorney learned that Ms. Monges would be promoted.

Nothing in this record suggests that Ms. Nichols's attorney communicated with Ms. Monges at any time when communication was barred by Rule 4.2, or even with the knowledge that Ms. Monges soon would assume a position that would implicate Rule 4.2. There is no basis to strike Ms. Monges's affidavit for unethical acquisition.

Mishawaka also raises a variety of specific objections to portions of the three affidavits submitted by Ms. Nichols in opposition to the summary judgment motion. The court embarks upon those objections in the hope that it completely absorbed Ms. Nichols's response brief. Perhaps stung by the allegation of

unethical conduct, Ms. Nichols's counsel adorned the response brief with demeaning phrases (*e.g.*, "All of Defendant's arguments conveniently ignore," "Such a suggestion is rather preposterous," "border on ridiculous," "rather disingenuous," "deceptively ignores," "Defendant throws these statements around with whimsical abandon") that add nothing to the argument, but lead a neutral reader to tend to skip over them in the hope of reaching the end of the 25-page brief. The response brief would have been stronger, more helpful, and — because it would have been easier for a neutral reader to work from start to finish — more persuasive without those phrases.

Ms. Nichols's reliance on Federal Rule of Evidence 807 as support for the admissibility of some of the challenged affidavit statements may be a casualty of the gratuitous epithets directed to Mishawaka's argument. At several places in her brief, Ms. Nichols argues that a particular statement is admissible under Rule 807 in part because it is more probative on the point for which it is offered than any other evidence Ms. Nichols can procure through reasonable efforts. The court's reading of the brief discloses no explanation why this might be so with respect to any of the statements. Accordingly, the court is unpersuaded that Rule 807 saves any statement in the affidavits from an otherwise valid hearsay objection.

With that, the court turns to the specific objections. Evidentiary material submitted for consideration with a summary judgment motion must be such as would be admissible in evidence at trial. Fed. R. Civ. P. 56(e); <u>Adusumilli v. City of Chicago</u>, 164 F.3d 353, 359 (7th Cir. 1998).

*Conflict with Nichols Deposition*

Mishawaka objects to paragraphs 4, 12, 15, and 21 of Ms. Nichols's affidavit as being inconsistent with her deposition. A party opposing summary judgment cannot create an issue of fact by submitting affidavit testimony that contradicts the affiant's earlier deposition. Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005); Diliberti v. United States, 817 F.2d 1259, 1263 (7th Cir. 1987). The asserted inconsistencies are inferential: Ms. Nichols's affidavit says things not mentioned specifically in her deposition testimony. Ms. Nichols, though, submitted an eleven-page summary of events as Exhibit B at her deposition, and that summary relates each of the incidents that Mishawaka says was not mentioned. There is no inconsistency between the affidavit and the deposition, so the court overrules those objections to Ms. Nichols's affidavit.

Mishawaka also objects to paragraphs 8, 9, and 12 of Patricia Rolens's affidavit as inconsistent (again, in the sense that the affidavit reports new material) with Ms. Nichols's deposition. Mishawaka cites no authority for the proposition that a party's witnesses cannot discuss events not mentioned in the party's (as distinct from the witness's) deposition. The court overrules those objections to Ms. Rolens's affidavit.

*Personal Knowledge/Opinion*

Mishawaka contends that several portions of the affidavits either are not based on personal knowledge or are impermissible opinions.

5

**1.** Mishawaka objects to several provisions in which the affiants assert that one person or another never did anything in response to various complaints. Mishawaka is correct that the phrases in the affidavits could be understood to exceed the affiants' personal knowledge, but the court isn't required to read them so expansively. The court reads those provisions as asserting only that the affiant has no knowledge of the official having done anything. This ruling applies to paragraphs 4, 5, 6, 7, 14, 15, 17, 19, 21, and 23 of Ms. Nichols's affidavit, to paragraph 9 of Ms. Rolens's affidavit, and to paragraphs 3, 10, and 11 of Ms. Monges's affidavit. The same reasoning supports the overruling of Mishawaka's objection to paragraph 26 of Ms. Nichols's affidavit (that no other dispatcher suffered similar treatment), and paragraph 11 of Ms. Rolens's affidavit and paragraph 6 of Ms. Monges's affidavit (that conditions of Ms. Nichols's employment differed from that of other dispatchers).

**2.** Whether the officials who took no action "ignored" the complaint (Nichols aff., ¶¶ 5, 14; Rolens aff., ¶¶ 9) or "condoned" the conduct complained of (Nichols aff., ¶¶ 8, 14) presents a different issue. Those statements amount to opinion on the thought processes of others. The affidavits contain no foundation for such opinions under Federal Rule of Evidence 701, so the court sustains Mishawaka's objections to those opinions. Similarly, the court sustains Mishawaka's objections to the affiants' opinions that the treatment of Ms. Nichols was intended as "punishment" (Nichols aff., ¶¶ 7, 8), about the retaliatory motive behind her treatment (Nichols aff., ¶¶ 8, 28; Rolens aff., ¶¶ 10, 12, 13; Monges aff., ¶ 4, 5),

and that the conduct directed at Ms. Nichols was "harassment" (Rolens aff., ¶¶ 9, 10).

**3.** Mishawaka also objects to paragraphs 23 and 24 of Ms. Nichols's affidavit and paragraph 12 of Ms. Monges's affidavit, in which the affiants set forth their understanding of certain city policies. The court overrules those objections, except to the extent the statements might be read as encompassing times other than those in which the affiants worked for Mishawaka. Perhaps longer terms of employment might have made their testimony worth more, but a sufficient foundation is laid under Federal Rule of Evidence 602.

**4.** Mishawaka objects to testimony (Rolens aff., ¶ 7; Monges aff., ¶ 4) that Ms. Nichols's work life was horrible, and to her testimony in paragraph 8 of Ms. Rolens's affidavit of that it was an everyday occurrence. The court overrules those objections. Ms. Rolens and Ms. Monges were co-workers of Ms. Nichols with ample opportunity to observe Ms. Nichols's work life and to form an opinion on its quality. On the other hand, when Ms. Rolens (aff., ¶ 12, 13) and Ms. Monges (aff., ¶¶ 7, 8) purport to articulate a "reasonable employee" standard by which to measure Ms. Nichols's comment, they cross into the realm of impermissible legal opinion (more accurately, argument), and the court sustains Mishawaka's objections.

**5.** Mishawaka objects to affiants identifying persons as "supervisors" (Nichols aff., ¶ 3; Rolens aff., ¶ 10; Monges aff., ¶ 5) as constituting legal opinions. The court overrules those objections. A different approach might be required

before a jury, but the court recognizes that a "supervisor" in every day parlance is not the same thing as a "supervisor" for purposes of employer liability for sexual harassment. The court accepts the affiants' testimony as meaning the former.

*Hearsay*

**1.** In paragraph 16 of her affidavit, Ms. Nichols says, "I was informed that day from Colleen Sherbun that Tim Korros did not want me to work on his shift and was further informed that many police officers were upset with me for reporting the pornography incident." Ms. Sherbun was the Mishawaka employee in charge of making schedules when the statement was made, so Ms. Sherbun's statement about the schedule is not hearsay. FED. R. EVID. 801(d)(2)(D).

**2.** In paragraph 18 of her affidavit, Ms. Nichols says, "Patty Rolens and Charlene Monges both stated that they wanted to talk about how I was being mistreated and wanted to know why management wasn't doing anything about it. Both Ms. Monges and Ms. Rolens stated that if they had been in the same situation that I faced, they would have already walked out the door." The first sentence asserts no facts capable of being true or false, and so is not hearsay. The second sentence is relevant to Mishawaka's affirmative defense regardless of whether the women really would have walked out the door. The court overrules the hearsay objection. For the same reason, the court overrules Mishawaka's hearsay objection to paragraph 9 of Ms. Monges's affidavit.

**3.** In paragraph 10 of her affidavit, Ms. Monges says that at a different meeting, "Cindy was concerned that assigning her to work on a mandatory basis with these other dispatchers would create significant issues of safety for the public." The fact that this statement was made to Mishawaka officials is relevant to Mishawaka's affirmative defense regardless of whether Ms. Nichols truly held such concerns, so the objection is overruled.

**4.** In paragraph 19 of her affidavit, Ms. Nichols says, "Several dispatcher had approached me, stating that Bowerman and Korros had told them they were out to get me fired because I had reported them." Those are out-of-court statements offered to prove the truth of the matter asserted; thus they are hearsay. FED. R. EVID. 801(c). Mishawaka's motion to strike that sentence is granted. FED. R. EVID. 802.

**5.** In paragraph 25 of her affidavit, Ms. Nichols says, "I was later told that that decision had been rescinded and that the time I had requested to provide care for my husband was given to Tracie Bowerman so that she could take additional bereavement days off. I was also told that, contrary to the policy of Exhibit 2, I was required to find my own replacement if I wanted these days off." To the extent the statement indicates that she was informed that she could not have certain time off and that she had to find a replacement, the hearsay objection is overruled: those are operative facts or matters not capable of being true or false. To the extent the statement indicates that an unidentified person told Ms. Nichols how

9

Mishawaka re-allocated her time off, the statement is hearsay, and Mishawaka's objection to the first sentence is sustained.

FACTS

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Ritchie v. Glidden Co., 242 F.3d 713, 720 (7th Cir. 2001). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would

10

convince a trier of fact to accept its version of events'" *(quoting* <u>Schacht v.</u>
<u>Wisconsin Dep't of Corr.</u>, 175 F.3d 497, 504 (7th Cir. 1999)).

The court sets forth the facts as favorably to Ms. Nichols as the record
allows.

Ms. Nichols began her six months of employment as a dispatcher in the
Mishawaka Police Department on December 16, 2002. Ms. Nichols told
communications director Coni McCloughen that she preferred to work the
midnight shift. Ms. McCloughen assigned Tracie Bowerman and Patty Rolens to
train her,[1] evaluate her, critique her performance, and ultimately recommend
whether she should get a pay raise or be discharged from employment. On their
first day together, Ms. Bowerman discussed her apparent sexual relationship with
Ms. McCloughen, calling Ms. McCloughen a "dike" and herself "Coni's bitch." Ms.
Bowerman told Ms. Nichols that Ms. Nichols's willingness to engage in sexual
activity with police officers was a key to success as a dispatcher. Ms. Nichols
deemed those comments belittling, offensive, and hostile, told Ms. Bowerman to
cease such remarks, and complained to Ms. McCloughen. The record discloses no
response by Ms. McCloughen. Ms. Nichols requested a shift change so she
wouldn't have to work with Ms. Bowerman.

Ms. Bowerman then became openly hostile to Ms. Nichols, and refused to
train or supervise her. Ms. Bowerman told Ms. Nichols that no one would mess

---

[1] Various other dispatchers—Coleen Sherbun, John Bevans, and Tim Korros—also assisted
in Ms. Nichols's training.

11

with Ms. Bowerman because she was sleeping with a police officer. On January 12, Ms. Bowerman wrote "Cindy sucks K-9 dicks" on Ms. Nichols's street guidebook. Ms. Bowerman thought it funny; Ms. Nichols thought it offensive, humiliating, and embarrassing. Ms. Nichols asked Ms. McCloughen to stop that behavior. The record discloses no response by Ms. McCloughen.

Ms. Nichols complained on January 27 to Assistant Police Chief Spencer, who told Ms. Nichols that the situation would be taken care of. Ms. Nichols's shift was changed so she no longer worked with Ms. Bowerman. Shift changes affect many aspects of a dispatcher's life, but Ms. Nichols considered this first shift change acceptable.

Ms. Bowerman's treatment of Ms. Nichols didn't change: on February 14, Ms. Bowerman wrote a note to Ms. Nichols saying, "Fuck U a lot more than yesterday. I mean it." The next day, Ms. Nichols was assigned to work with Mr. Bevans under Mr. Korros's supervision. During that shift, Mr. Korros, Mr. Bevans, and Ms. Bowerman watched pornographic movies in the dispatch center. Ms. Nichols complained, but the movies continued. Ms. Bowerman gave loud instruction on giving a "perfect blow job," discussed one actor's penile endowment, and described how an erect penis should be handled during sexual activity to avoid fracturing it. Ms. Nichols eventually left her workstation for an adjoining break room, but Ms. Bowerman's voice increased in volume, as well. Upon returning to the dispatch center, Ms. Nichols found Ms. Bowerman and Mr.

12

Bevans rubbing each other's backs and moaning; they continued that conduct throughout the shift despite Ms. Nichols's repeated requests that they stop.

Ms. Nichols complained to Ms. McCloughen, saying the only thing she was learning from Ms. Bowerman was "how to give a perfect blow job." Ms. McCloughen gave Ms. Nichols with a copy of Mishawaka's sexual harassment policy, and Ms. Nichols followed up with a written memo. Mishawaka investigated the incident and concluded that Ms. Bowerman had violated the city's sexual harassment policy and created a hostile work environment. Mishawaka's Human Resources Director considered Ms. Bowerman's conduct to be a major offense. Ms. Bowerman was given a three-day unpaid leave upon her return from vacation. Ms. Nichols's shift was changed again, this time to the afternoon shift. Mr. Bevans was fired.

After the firing of Mr. Bevans, Ms. Nichols began to suffer what she views as retaliation virtually every day at work. She was switched from shift to shift.[2] Mr. Korros threw books around the dispatch center and said he would never again work with or train Ms. Nichols because she had complained about sexual harassment on the job. Mr. Korros had allowed Ms. Nichols to watch him handle

_____

[2] Ms. McCloughen says in her affidavit that she changed Ms. Nichols's shifts because Ms. Nichols asked her to because of her problems working with certain employees. Ms. McCloughen says that other than the pornography incident, she didn't view Ms. Nichols's complaints as involving sexual harassment, but rather personality conflicts. Ms. Nichols believes the shift changes were retaliatory and sexual harassment. Summary judgment is not the occasion for resolution of that disagreement. In any event, the shift changes didn't affect Ms. Nichols's salary, duties, or benefits.

the police channel and let her work the police channel a few minutes each day, but since the police channel required hands-on experience under the trainer's supervision, Ms. Nichols didn't consider that to be "training." Ms. Sherbun and Mr. Korros, supposedly among Ms. Nichols's trainers, refused to work with her. A police officer stopped Ms. Nichols in the hall and told her, "You should've kept your mouth shut!" Ms. Bowerman and Mr. Korros sabotaged Ms. Nichols's work by not helping her or by purposely not informing her of emergency situations that existed. Ms. Bowerman, Mr. Korros, and others openly plotted with others about how to end Ms. Nichols's employment. Other dispatchers gave Ms. Nichols evil looks and directed comments towards her like, "Don't talk to her, it might be harassment!" or "Stop it, you're harassing me!"

On March 13, an equipment problem prevented Ms. Nichols from notifying a police officer about an active arrest warrant for a subject. Ms. Bowerman wouldn't assist Ms. Nichols in an active warrant search for a police officer. The record doesn't reflect any discipline of Ms. Bowerman for that conduct.

Mishawaka ordinarily allowed dispatchers to work overtime once they were cleared on a channel, but required Ms. Nichols to be cleared on all three channels before she could work overtime. On March 20, Ms. Nichols passed IDACS training at the Bremen state police post. Mishawaka ordinarily allowed a dispatcher sent for IDACS training to go home with a full day's pay when the training was done, but Ms. Nichols had to return to work after IDACS training. The record identifies no other dispatcher who had to do so. Ms. Nichols's shift was changed at least five

14

times in the first five months of her employment; the record identifies no other dispatcher whose shift was changed so often.

Leisel Hibbs trained Ms. Nichols on the police channels in late March or early April. Ms. Nichols completed her training on the police channel in April, and became certified on the fire and IDACS channels. Ms. Nichols received a pay increase after ninety days on the job.

Ms. Nichols's shift was changed again on March 23. She told Ms. McCloughen and Assistant Chief Spencer how difficult it was to deal with the treatment she was receiving on the job and all of the shift changes. The record contains no indication that anything was done in response to her complaints. At a mandatory meeting for dispatchers held on March 25, Ms. Rolens and Ms. Monges asked why management wasn't doing anything about how Ms. Nichols was being treated; both said they would have walked out the door had they been in the same situation. Assistant Chief Spencer said the matter was a private issue and refused to discuss it.

On April 6, Ms. Bowerman approached a seated Ms. Nichols from behind and shoved the back of her chair hard enough that Ms. Nichols nearly fell out of the chair. Ms. Nichols and Ms. Rolens both spoke to Ms. McCloughen about the incident, and Ms. Nichols also sent Ms. McCloughen an e-mail about her treatment at work. In the e-mail, Ms. Nichols reported what other dispatchers had told her: that Ms. Bowerman and Mr. Korros had said they were out to get Ms.

Nichols fired because she had reported them. The record discloses no response to the verbal complaints or the e-mail.

Another meeting of dispatchers was held on April 29. Ms. Nichols complained that her treatment at the hands of co-employees seemed to be worsening and that co-employees refused to work with her. She expressed concern that she couldn't work effectively with dispatchers who had consistently refused to work with her in the past, and that co-employees' sabotage of her work would endanger the public. Assistant Chief Giannuzzi angrily asked why Ms. Nichols was raising those concerns at that meeting and said that what happened in the past was going to stay in the past. When told that the hostility against Ms. Nichols was a matter in the present rather than in the past, Police Chief Weber slammed his hand on the table and said to Ms. Nichols, "I'm sorry. I thought this had been resolved!"

The record doesn't disclose any action that was taken in response to the April 29 comments, though Ms. Nichols was moved to the midnight shift at the end of April and remained on that shift until her employment ended, and she had no problems with co-employees on that shift. Ms. Nichols's training was complete when she moved to the midnight shift.

On May 12, City Attorney John Gourley telephoned Ms. Nichols and asked about the problems, which Ms. Nichols says she reported in full. Mr. Gourley said he would look into the situation and get back to her, but things happened very quickly in the next two days.

16

"On-call overtime" in the dispatch center is a four-hour shift before and after a dispatcher's shift. A dispatcher on the on-call overtime schedule must work if a regularly scheduled dispatcher reports an inability to work and no one voluntarily takes the overtime. The on-call overtime policy ensures that at least three dispatchers—the minimum number—are working in the dispatch center on each shift. Ms. Nichols understood the policy to be that if a dispatcher called in sick or took time off leaving insufficient staff, the dispatcher on the schedule would get mandatory overtime; if no one called in sick or called off, the dispatcher on the schedule wouldn't have to work.

Ms. Nichols says that on May 12, Ms. McCloughen approved Ms. Nichols's request to take May 17 and 18 off to care for her husband following surgery. Ms. McCloughen recalls the approval occurring two days later, but her report is otherwise uncontradicted. She recalls Ms. Nichols telephoning her with a request to take off May 17 and 18 (days Ms. Nichols was scheduled to work full shifts) because her husband was scheduled to have surgery. Another dispatcher was on vacation that week, but given the medical situation, Ms. McCloughen approved the request. Ms. McCloughen didn't know, and didn't check, whether Ms. Nichols was on the schedule for on-call overtime. It turns out that Ms. Nichols was scheduled to be on-call on May 17 and May 19.

Mishawaka's policy on "Emergency Situations Requiring Overtime" provided as follows:

17

In the event of an "Emergency Situation" which may require overtime to cover a position, it will become management discretion to fill the need. The policies that cover the issues of on-call, posted overtime and short notice overtime may not be followed due to an emergency. If a dispatcher has been assigned overtime or signed the overtime list and an emergency arises, (Le. illness, accidents, family emergencies, funeral leave etc.) the dispatcher may not be required to find their own replacement. Management may authorize the use of the short notice call in or mandatory the person on call.

On May 15, when Ms. Nichols arrived for her midnight shift, she learned that Ms. McCloughen had taken her name off the schedule, but then had put her back on the work schedule and on mandatory overtime duty for May 17 and 18. Ms. Nichols and another dispatcher found someone to take her work schedule, but Ms. Nichols didn't try to find someone to replace her on the mandatory overtime duty schedule. Instead, she called Ms. McCloughen and asked why she was on the mandatory overtime list. Ms. McCloughen said she would see what she could do the next morning, but said that as things stood, Ms. Nichols needed to find a replacement worker if she wanted to take the time off. Ms. Nichols called Ms. McCloughen again about an hour later saying that wouldn't be necessary because she was leaving. Ms. Nichols chose to leave work to care for her husband. She contends that by foisting that choice upon her, Mishawaka constructively discharged her.

Ms. Nichols left the dispatch center before the end of her shift, leaving only two dispatchers (one below the minimum). Ms. McCloughen recommended that Ms. Nichols's employment be terminated because she left the dispatch center understaffed. Police Chief Weber terminated her employment.

18

PLAINTIFF'S CLAIMS

Ms. Nichols first contends that she was subjected to a hostile work environment on account of her sex. Mishawaka claims entitlement to summary judgment, first, because the conduct didn't rise to the level of a hostile work environment and, second, because Mishawaka took reasonable steps to remedy the harassment in response to Ms. Nichols's complaints.

Ms. Nichols also contends that she was subjected to impermissible retaliation for having complained about sexual harassment. Mishawaka seeks summary judgment, first, because no adverse action was taken against Ms. Nichols and, second, because Mishawaka had non-retaliatory reasons for its actions.

Finally, Ms. Nichols says she was constructively discharged from her employment. Mishawaka argues that the conditions that led Ms. Nichols to leave were not sufficiently severe to amount to a constructive discharge.

Ms. Nichols brought all of her claims against both the City of Mishawaka and the Mishawaka Police Department. In her summary judgment brief, Ms. Nichols agreed that the police department is entitled to summary judgment because it is not an entity separate from the city. *See* <u>Jones v. Bowman</u>, 694 F. Supp. 538 (N.D. Ind. 1988).

*Hostile Work Environment*

A plaintiff alleging hostile environment sexual harassment must demonstrate that (a) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal and physical conduct of a sexual nature; (b) the harassment was based on sex; (c) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (d) there is a basis for employer liability. Raciot v. Wal-Mart Stores, Inc., 414 F.3d 675, 677 (7th Cir. 2005); Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998). Courts consider all the circumstances, such as the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Ms. Nichols has come forth with evidence from which a jury could find that the harassment she suffered at work interfered with her work performance and that there is a basis for employer liability. The record does not, however, contain evidence from which a reasonable jury could find that the harassment of Ms. Nichols was based on her sex. *See* Beamon v. Marshall & Isley Trust Co., 411 F.3d 854, 863-864 (7th Cir. 2005) ("the alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race").

Ms. Nichols points to the following events as comprising harassment based on her sex (although she also argues that some of them spring from retaliatory motive, as well): (1) Ms. Bowerman told that her success as a dispatcher depended upon her willingness to have sex with police officers; (2) Ms. Bowerman subjected Ms. Nichols to discussions about an apparent sexual relationship between her Ms. Bowerman and Ms. McCloughen; (3) Ms. Bowerman wrote "Cindy sucks K-9 dicks" on her street atlas; (4) after Ms. Nichols complained, Ms. Bowerman wrote, "Fuck U more today than yesterday. I mean it"; (5) pornographic movies were shown in the dispatch center during her shift; (6) Ms. Nichols had to listen to Ms. Bowerman describe "perfect blow job" technique, discuss proper handling of an erect penis, and describe the size of the movie actor's penis; (7) Ms. Bowerman and Mr. Bevans refused Ms. Nichols's requests that they stop watching (and discussing) the pornography during work; (8) Ms. Bowerman and Mr. Bevans massaged and rubbed each other in a sexually suggestive way in Ms. Nichols's presence; (9) after she complained (a) her shift assignments were changed repeatedly, (b) others refused to work with and train her, (c) Ms. Bowerman physically assaulted her, (d) Mr. Korros threw books around the dispatch center, and (e) a police officer told her she should have kept her mouth shut; (10) Ms. Bowerman and Mr. Korros sabotaged her work by failing to assist her and notify her of emergency situations; (11) Ms. Bowerman and Mr. Korros plotted ridding themselves of her; (12) co-employees greeted her with evil looks and snide comments; (13) she was denied overtime that other dispatchers received even

21

though the others had cleared only one channel; (14) she had to return to work after IDACS training though other dispatchers received full days' pay without returning to work; and (15) when she and others tried to complain about her harassment, nothing was done.

This evidence would not allow a reasonable trier of fact to find that it is more likely than not that anything other than the first incident was directed at Ms. Nichols on account of her sex. Although the comment about providing police officers with sexual favors to assure advancement is distasteful, "occasional vulgar banter, tinged with sexual innuendo of course or boorish workers" is not sufficient to amount to hostile environment sexual harassment. Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-431 (7th Cir. 1995).

Ms. Nichols's summary judgment brief offers only a conclusory statement that it is self-evident that the conduct was based on her sex, and a notation that Mishawaka itself viewed Ms. Bowerman's activity as sexual harassment. Mishawaka referred Ms. Bowerman to an employee assistance program because Ms. Bowerman had violated Mishawaka's sexual harassment policy and had engaged in inappropriate workplace behavior. Ms. Bowerman received an employee disciplinary notice saying that her unprofessional conduct created a hostile work environment for Ms. Nichols. Were the issue closer, Mishawaka's statements might well create a genuine issue of material fact. Mishawaka, though, doesn't have the authority to decide the meaning of federal law for a jury. Even with Mishawaka's determination that Ms. Bowerman violated sexual harassment

policy, this record would not allow a finding that the harassment of Ms. Nichols was based on her sex.

Mishawaka is entitled to summary judgment on Ms. Nichols's sexual harassment/hostile work environment claim.

*Retaliation*

Ms. Nichols claims Mishawaka is liable to her for the treatment she received in retaliation for complaining about what she perceived to constitute sexual harassment. Mishawaka claims entitlement to judgment on Ms. Nichols's retaliation claim because, Mishawaka says, Ms. Nichols suffered no adverse employment action, and no official action taken against Ms. Nichols was motivated by her protected activity.

> A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method. The direct method requires the plaintiff to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. Under the alternative indirect method, the plaintiff must establish a prima facie case of retaliation by showing that: (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes the prima facie case, the burden shifts to the employer to present evidence of a non-discriminatory reason for its employment action. If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual.

Moser v. Indiana Dep't of Correction, 406 F.3d 895, 903-904 (7th Cir. 2005) (citations omitted); *accord* Walker v. Mueller Indus., Inc., 408 F.3d 328, 333 (7th Cir. 2005).

An actionable adverse employment action is one that materially alters the terms and conditions of employment, such firing, failing to promote, reassignment with significantly different responsibilities, or a significant change in benefits. Stutler v. Illinois Dep't of Corrections, 263 F.3d 698, 703 (7th Cir. 2001). Whether a change in a job or working conditions is materially adverse or essentially neutral is a question of fact "'and so can be resolved on summary judgment only if the question is not fairly contestable.'" Basith v. Cook County, 241 F.3d 919, 933 (7th Cir. 2001) *(quoting* Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 273-274 (7th Cir. 1996)).

Ms. Nichols says she suffered myriad shift changes that affected every aspect of her life, was denied the opportunity to work overtime, was required to return to work after IDACS training, was denied use of the family medical emergency policy, had her days off rescinded, and was constructively discharged. She doesn't assert in her summary judgment response that her co-employees' hostility constituted an adverse employment action.[3]

---

[3] General hostility and comments ordinarily don't rise to the level of a change in terms or conditions of employment, Walker v. Mueller Indus., Inc., 408 F.3d 328, 331 (7th Cir. 2005), though retaliatory harassment can constitute adverse employment action if it is severe enough to cause a significant change in the plaintiff's employment status. Stutler v. Illinois Dep't of Corrections, 263 F.3d at 703-704; Knox v. State of Indiana, 93 F.3d 1327, 1335-1336 (7th Cir. 1996).

(continued...)

Ms. Nichols's shift changes and denial of days off, though doubtlessly quite difficult for her, do not amount to adverse employment actions because they didn't affect the terms and conditions of her employment. *See* <u>Griffin v. Potter</u>, 356 F.3d 824, 829 (7th Cir. 2004); <u>Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.</u>, 254 F.3d 644, 654 (7th Cir. 2001). So, too, with respect to the requirement that she return to work after her IDACS training; even if others got part of a day off with pay under similar circumstances, denial of a few hours' paid leave does not amount to an alteration of terms and conditions of employment.

Mishawaka contends that failure to make overtime available to an employee is not an adverse employment action, but it cites no authority for that proposition, and while no case in this circuit has provided a definitive answer to the question, recent cases suggest that failure to allow an employee an equal opportunity for overtime may amount to an adverse employment action. *See, e.g.*, <u>Mannie v. Potter</u>, 394 F.3d 977, 983-984 (7th Cir. 2005) (plaintiff never requested overtime); <u>O'Neal v. City of Chicago</u>, 392 F.3d 909, 912 (7th Cir. 2004) (no proof of claim of less overtime); <u>Wyninger v. New Venture Gear, Inc.</u>, 361 F.3d 965, 979 (7th Cir. 2004) (no proof that others were paid overtime for the sort of work plaintiff performed).

---

[3](...continued)

Ms. Nichols's decision not to rely on co-employee hostility may stem from her comment in her deposition exhibit that, "In the ten days prior to starting the hands on training it was very disappointing to hear how hostile the employees were toward each other, the Director, and many Officers they were working with, as well as Chiefs and Asst. Chiefs."

Ms. Nichols did not leave her job because of the lack of overtime, though. Indeed, it was Mishawaka's insistence on overtime that provided her last straw. While a constructive discharge constitutes a material alteration of terms of employment, that which does not amount to an adverse employment action cannot give rise to a constructive discharge. Griffin v. Potter, 356 F.3d at 830. A plaintiff claiming she was constructively discharged must "prove both harassing behavior sufficiently severe or pervasive to alter the conditions of her employment, and that 'the abusive working environment became so intolerable that her resignation qualified as a fitting response.'" Levenstein v. Salafsky, 414 F.3d 767, 774 (7th Cir. 2005) (*quoting* Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2347 (2004)). Failure to provide time off is not an adverse employment action and so cannot qualify as a constructive discharge. The summary judgment briefs seem to treat the constructive discharge issue as a separate claim, but it would not seem to provide a separate federal claim apart from Title VII.

The failure to make overtime available is only action of which Ms. Nichols complains that amounts to an alteration in the terms or conditions of her employment, but a retaliation plaintiff needn't prove multiple adverse actions. Ms. Nichols engaged in statutorily protected activity when she complained about what she viewed as harassment; a retaliation plaintiff need not show that her complaint about sexual harassment was valid, as long as it was made in good faith and was not utterly baseless, Mattson v. Caterpillar, Inc., 359 F.3d 885, 892 (7th Cir.

26

2004), and Mishawaka doesn't contend that Ms. Nichols's complaints about Ms. Bowerman's conduct was not activity protected by Title VII. Nor does Mishawaka contend that Ms. Nichols was not meeting its legitimate expectations of her. The affidavits of Ms. Nichols, Ms. Monges, and Ms. Rolens would support a finding that Ms. Nichols was treated less favorably with respect to the opportunity for overtime than similarly situated employees who did not engage in statutorily protected activity. Ms. Nichols has made out a *prima facie* case of retaliation.

Mishawaka has not offered a legitimate non-discriminatory reason for holding Ms. Nichols to a different standard of eligibility for overtime, so Ms. Nichols needn't come forth with evidence of pretext to avoid summary judgment. A retaliation plaintiff proceeding under the indirect method needn't show any causal link between the protected activity and the adverse employment action to defeat a summary judgment motion. Stone v. City of Indianapolis Pub. Util. Div., 281 F.3d 640, 643-644 (7th Cir. 2002). Mishawaka is not entitled to summary judgment on Ms. Nichols's retaliation claim.

CONCLUSION

For the foregoing reasons, the court GRANTS IN PART the defendants' summary judgment motion. The motion is GRANTED with respect to all claims against the Mishawaka Police Department, is GRANTED with respect to the sexual harassment/hostile work environment claim against the City of Mishawaka, and is GRANTED to the extent the retaliation claim is based on any action by

Mishawaka other than failing to make overtime available to the plaintiff. The case remains at issue on the claim of retaliatory failure to make overtime available.

SO ORDERED.

ENTERED:   August 19, 2005

  /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court